**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| KAROLINE HEBERT, individually and on behalf of all others similarly situated, | * | CIVIL ACTION NO: 2:26-cv-01908-GGG-MBN |
| Plaintiff, | * | JUDGE: GREG GUIDRY |
| v. | * | MAGISTRATE JUDGE: MICHAEL NORTH |
| CHOSEN FOODS, LLC, | * | CLASS ACTION |
| Defendant. | * | JURY TRIAL DEMANDED |

**FIRST SUPPLEMENTAL AND AMENDING CLASS ACTION COMPLAINT FOR DAMAGES**

NOW INTO COURT, through undersigned counsel, comes plaintiff, Karoline Hebert, individually and on behalf of those similarly situated, who, pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure, respectfully files this First Supplemental and Amending Complaint, which amends, supplements, and restates the original Complaint [Rec. Doc. 1] in its entirety and supersedes it as the operative pleading in this matter, and in support avers as follows:

## INTRODUCTION

Chosen Foods has built its entire brand identity on a promise of purity, marketing itself as "America's #1 Avocado Oil" and touting itself, repeatedly and without qualification, as one of only a few avocado oil brands that can guarantee its products are 100% pure. Defendant has told consumers that it tests every batch of its oil, that it can trace its supply chain from the avocado grove to the bottle, and that its purity commitment covers its avocado oils and its sprays alike.

In July 2026, the same University of California, Davis researchers who have studied avocado oil purity since 2020 published a new peer-reviewed study in the journal *Applied Food*

*Research*. This time, the researchers tested processed foods that use avocado oil as an ingredient, including mayonnaise and salad dressings. Every one of the four Chosen Foods products included in the study, Chosen Foods Classic Mayo, Chosen Foods Vegan Mayo, Chosen Foods Lemon Garlic Dressing & Marinade, and Chosen Foods Zesty Italian Dressing & Marinade, failed authenticity testing in both of the two independently collected production lots examined, an eight-for-eight failure rate. Chosen Foods Classic Mayo, one of the very products that failed, is one of the Chosen Foods products Plaintiff purchased and is at issue in this action.

Defendant did not dispute that its own products were tested or that they failed. Instead, Defendant publicly maintained that it never adds seed oils of any kind, even as the Texas Attorney General opened an industry-wide investigation and issued Defendant a civil investigative demand to determine whether Defendant violated Texas consumer protection law.

In the same public statement, Defendant made an admission that frames this case. Defendant told consumers that it starts with “the same pure avocado oil” in its mayonnaise and dressings that goes into its cooking oils, and that for years all of its avocado oil has been tested for purity, internally and by third parties, before it goes into any of its products. Defendant offered those statements in its own defense. They are instead an admission that a single, purportedly tested oil supply stands behind Defendant’s entire product line, including the Chosen Foods 100% Pure Avocado Oil Spray that Plaintiff purchased in New Orleans, Louisiana, and that the products made from that supply failed independent authenticity testing in every lot tested.

The representation at the center of this action, “100% Pure Avocado Oil,” appears not only on the mayonnaise and dressing products that UC Davis tested, but on the front of every avocado oil product Defendant sells, including the Spray. Defendant’s own marketing describes its purity

guarantee as covering its avocado oils and its sprays collectively, not as a promise limited to whichever SKU happens to be tested in a given study.

What Defendant has done, as to its tested mayonnaise and dressing products, is economic adulteration: the avocado oil its labeling promises was substituted with, or diluted by, cheaper refined vegetable and seed oils, while Defendant continued to charge consumers the premium that "100% Pure Avocado Oil" commands across its entire product line, including the Spray. And the representations Defendant used to sell every product in that line, that its purity is "guaranteed" and verified by testing of every batch, were false or misleading in their own right: either the represented testing did not occur as described, or it failed to detect what independent testing detected in eight out of eight lots. Plaintiff and the Class paid a premium for one thing and received, or bore an undisclosed and material risk of receiving, another.

## PARTIES

1. Plaintiff Karoline Hebert is a natural person and citizen of the State of Louisiana who, at all material times, purchased Chosen Foods avocado oil-labeled products in New Orleans, Louisiana, including the Chosen Foods 100% Pure Avocado Oil Spray and Chosen Foods Classic Mayo at issue in this action.

2. Defendant Chosen Foods LLC is a limited liability company organized under the laws of the State of Delaware, with its headquarters and principal place of business in San Diego, California. Chosen Foods was founded in 2011 and is majority owned by Butterfly Equity, a private equity firm based in Los Angeles, California.[1] Chosen Foods manufactures, markets, and distributes a line of avocado oil products, including bottled avocado oil, avocado oil sprays,

[1] *The UC Davis Avocado Oil Study: What It Actually Found*, LocalFats.com (Aug. 13, 2026), https://localfats.com/blog/avocado-oil-packaged-foods-uc-davis-study.

avocado oil mayonnaise, and avocado oil salad dressings and marinades, which it sells nationwide, including throughout Louisiana, through major retailers. Chosen Foods markets itself as "America's #1 Avocado Oil" and describes itself as one of the few avocado oil brands on the market that can guarantee its products are 100% pure.[2] Upon information and belief, no member of Chosen Foods LLC is a citizen of the State of Louisiana.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). For purposes of CAFA, an unincorporated association such as Defendant is deemed a citizen of the State under whose laws it is organized and of the State where it has its principal place of business. 28 U.S.C. § 1332(d)(10). Minimal diversity exists because Plaintiff is a citizen of Louisiana and Defendant is a citizen of Delaware and of California, where its principal place of business is located; at least one member of the proposed Class is a citizen of a State different from Defendant. The proposed Class consists of more than 100 members, and the aggregate claims of all members of the proposed Class exceed $5,000,000, exclusive of interest and costs. In addition, and upon information and belief, no member of Defendant is a citizen of Louisiana.

4. This Court has personal jurisdiction over Defendant. Defendant purposefully availed itself of the benefits of this District by marketing, distributing, and selling the Products to consumers in Louisiana, including to Plaintiff in New Orleans, Louisiana. Defendant sells its Products nationally. Defendant derives substantial revenue from the sale of its products to

[2]Chosen Foods, *Chosen Foods Asserts Its Commitment to Purity Amid New Research from UC Davis Exposing Adulteration in Avocado Oil Industry*, BusinessWire (June 6, 2023), https://www.businesswire.com/news/home/20230606005454/en/Chosen-Foods-Asserts-Its-Commitment-to-Purity-Amid-New-Research-from-UC-Davis-Exposing-Adulteration-in-Avocado-Oil-Industry.

Louisiana consumers. In addition, a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendant's dissemination of the labeling and marketing representations at issue to consumers in this District, Plaintiff's exposure to and reliance on those representations in this District, Plaintiff's purchases in this District, and the economic injury Plaintiff sustained in this District. Venue is also proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District within the meaning of 28 U.S.C. § 1391(c)(2), as Defendant is subject to personal jurisdiction in this District with respect to this action.

## FACTUAL BACKGROUND

### A. Defendant's "100% Pure" Avocado Oil Brand and Marketing

6. Chosen Foods was founded in 2011 and has built its entire brand identity around the purity of its avocado oil. Chosen Foods markets itself to consumers as "America's #1 Avocado Oil" and, since at least 2020, has repeatedly and publicly represented that it is among the very few avocado oil brands that can guarantee its products are 100% pure.

7. Chosen Foods' product line includes bottled avocado oil, avocado oil spray, avocado oil mayonnaise, and avocado oil salad dressings and marinades. Chosen Foods sells these products nationally, including at stores throughout Louisiana.

8. Defendant does not confine its purity guarantee to a single product. In a June 6, 2023 press release, Defendant expressly represented that it was reassuring consumers of the purity of its "avocado oils and sprays" together, and stated that it guarantees that purity by testing every batch of its oil and by maintaining a supply chain with traceability from the avocado grove to the

bottle.[3] Defendant's then-Chief Executive Officer, Gabriel Perez Krieb, was quoted in the same release stating that Chosen Foods takes great pride in its products and guarantees that every bottle of its 100% pure avocado oil is exactly that and nothing else. Defendant's purity claims are, by Defendant's own description, brand-wide undertakings that apply across its avocado oil, spray, mayonnaise, and dressing lines, not claims limited to a single package or SKU.

9. Defendant has repeated and reinforced its guarantee over time. In a November 26, 2024 press release applauding the Codex Alimentarius Commission's decision to adopt an international purity standard for avocado oil, Defendant again described itself as among the few brands able to guarantee 100% purity and pointed to the 2020 UC Davis study discussed below as continuing proof of that guarantee.[4]

10. Defendant repeats the brand-wide guarantee in the standard corporate description appended to its public announcements. From at least June 2023 into 2026, the "About Chosen Foods" section of Defendant's press releases has described Chosen Foods as America's #1 Avocado Oil and Avocado Oil Spray and has represented that its avocado oil "is always 100% pure."[5] That standing description extends the purity representation to Defendant's sprays by name and states the guarantee in categorical terms.

11. Defendant has likewise made the absence of seed oils a centerpiece of its national advertising. In January 2026, Defendant launched a national advertising campaign, "Chosen to Save Food," aimed at ridding grocery shelves of what Defendant characterized as seedy

---

[3] Chosen Foods, *supra* note 2.

[4] Chosen Foods, *Chosen Foods Applauds Codex Alimentarius Commission's Decision to Establish an International Standard for Avocado Oil Purity*, BusinessWire (Nov. 26, 2024), https://www.businesswire.com/news/home/20241126509765/en/Chosen-Foods-Applauds-Codex-Alimentarius-Commissions-Decision-to-Establish-an-International-Standard-for-Avocado-Oil-Purity.

[5] See, e.g., Chosen Foods, *Chosen Foods Launches 100% Pure Avocado Oil in Convenient New Squeeze Bottle*, BusinessWire (Oct. 8, 2024), https://www.businesswire.com/news/home/20241008197584/en; Chosen Foods, *supra* note 4.

ingredients.[6] Months before the study described below was published, Defendant was marketing itself as the brand consumers could trust specifically to keep seed oils out of their food.

12. The words "100% Pure Avocado Oil" appear as part of the name and front-label identity of Defendant's avocado oil products, including the Chosen Foods 100% Pure Avocado Oil Spray that Plaintiff purchased. Consumers who see "100% Pure Avocado Oil" on the front of a Chosen Foods package reasonably understand Defendant to be repeating, as to that specific product, the same purity guarantee that Defendant has told the public applies to its avocado oils and sprays collectively.

**B. The 2020 UC Davis Study and Defendant's Use of It to Market Its Purity**

13. In 2020, UC Davis researchers tested 22 brands of avocado oil and found that only two were 100 percent pure; Chosen Foods was one of the two.[7] Defendant has used that result ever since as a centerpiece of its national marketing, repeatedly telling consumers that independent, peer-reviewed science supports its purity guarantee.

14. Defendant's reliance on the 2020 study to support brand-wide purity claims, without qualifying those claims as limited to the specific bottled avocado oil tested in 2020, reinforced consumers' reasonable understanding that Defendant's entire avocado oil product line, including products introduced or reformulated after 2020, met the same standard.

**C. The July 2026 UC Davis Study Found Defendant's Products Adulterated**

---

[6] Chosen Foods, *Chosen Foods Launches "Chosen to Save Food" Campaign to Vanquish Seedy Ingredients from the Grocery Store*, BusinessWire (Jan. 13, 2026), https://www.businesswire.com/news/home/20260113358196/en/Chosen-Foods-Launches-Chosen-to-Save-Food-Campaign-to-Vanquish-Seedy-Ingredients-from-the-Grocery-Store.

[7] Chosen Foods, *supra* note 2; see also Hilary S. Green & Selina C. Wang, *First report on quality and purity evaluations of avocado oil sold in the US*, Food Control (2020), https://www.sciencedirect.com/science/article/pii/S0956713520302449.

15. In July 2026, the same UC Davis research group published a new peer-reviewed study in the journal *Applied Food Research*, this time examining processed foods that use avocado oil as an ingredient, rather than standalone bottled oil. The study, titled *Authenticity of avocado and olive oils used as ingredients in commercially processed foods*, was published online on July 11, 2026.[8]

16. The researchers purchased 37 products labeled as containing avocado oil or olive oil as the sole edible oil ingredient from California retail stores and online retailers in 2025 and 2026, collected in two separate production lots each, for a total of 74 samples across chips, mayonnaise, and salad dressings.[9]

17. The researchers measured fatty acid and sterol profiles and compared them against the Codex Alimentarius Standard for Named Vegetable Oils (CXS 210), to which avocado oil compositional criteria were added in November 2024. The classification criteria were deliberately forgiving: a sample could deviate on a single marker by up to 10 percent and still be classified as consistent; a sample failing on no more than two markers, without corroborating deviations elsewhere, was treated as merely borderline rather than inconsistent; and a sample that was consistent on its fatty acid profile and merely borderline on its sterol profile, or the reverse, was likewise classified as consistent.

18. The researchers also tested whether ordinary food processing, including frying and emulsification, could explain the deviations they observed. They prepared model chips and mayonnaise using retail avocado oil with profiles that fell within the applicable Codex ranges, then

[8] Natalie Lopez-Alvarez, Xueqi Li, Benjamin Vizgordiski & Selina C. Wang, *Authenticity of avocado and olive oils used as ingredients in commercially processed foods*, 6 Applied Food Research 102389 (2026), https://doi.org/10.1016/j.afres.2026.102389.

[9] LocalFats.com, *supra* note 1.

fried or emulsified those model products and re-measured them. The changes attributable to processing were minor: major fatty acids shifted by less than 0.6 percentage points from frying and by no more than 0.3 percentage points from emulsification, and sterols shifted by no more than 0.5 percentage points from emulsification. The researchers concluded that ordinary processing could not account for the magnitude of the deviations they measured in the tested products.

19. Overall, 48 of the 54 avocado oil-labeled samples tested, or 89 percent, were classified as compositionally inconsistent with authentic avocado oil. Ninety-three percent of the chip samples, 71 percent of the mayonnaise samples, and 100 percent of the salad dressing samples failed.[10] By contrast, only 1 of 20 olive oil-labeled samples failed. Olive oil composition has been standardized and policed internationally for decades; avocado oil received its first international compositional standard in November 2024. The near-perfect performance of the olive oil control samples under the same methodology confirms that the testing does not generate failures at any rate that could explain the results for the avocado oil-labeled products, including Defendant's.

20. Chosen Foods had four products included in the study: Chosen Foods Classic Mayo, Chosen Foods Vegan Mayo, Chosen Foods Lemon Garlic Dressing & Marinade, and Chosen Foods Zesty Italian Dressing & Marinade.[11] Every one of Defendant's four tested products was classified as compositionally inconsistent with authentic avocado oil in both of the two independently collected production lots tested, an eight-for-eight failure rate. The failure was not a single marginal deviation in a single lot. It was a pattern, replicated across every Chosen Foods

---

[10] Jeff Gelski, *Texas investigating avocado oil claims*, Baking Business (Aug. 25, 2026), https://www.bakingbusiness.com/articles/66792-texas-investigating-avocado-oil-claims; Lopez-Alvarez et al., *supra* note 8.

[11] LocalFats.com, *supra* note 1 (reproducing the product-by-product, lot-by-lot results published in the UC Davis media kit accompanying the study).

product tested and across every lot of each product, under criteria the researchers designed to give the tested products every benefit of the doubt.

21. The tested samples exhibited reduced palmitic acid, palmitoleic acid, and cis-vaccenic acid; reduced beta-sitosterol and clerosterol; and elevated stearic acid, campesterol, stigmasterol, and delta-7 sterols, a pattern the researchers identified as characteristic of substitution with seed oils such as canola, soybean, sunflower, or safflower oil.

22. The two markers that most strongly discriminated authentic avocado oil from the failing samples cannot be explained by ordinary refining. Palmitoleic acid, which the Codex standard places between 4.0 and 17.1 percent of total fatty acids in authentic avocado oil, fell below the 4.0 percent floor in 47 of the 54 avocado oil-labeled samples. Cis-vaccenic acid, a fatty acid that avocado oil carries and most seed oils lack, averaged 1.7 percent in the failing samples against 5.3 percent in the samples that passed.[12] Refining, which Defendant's own labeling discloses (the Spray is labeled "Naturally Refined"), may elevate certain markers, such as stearic acid and delta-7 sterols. It does not deplete palmitoleic acid or cis-vaccenic acid. Depletion of those markers indicates the presence of oils that do not contain them, that is, dilution or substitution with seed oils.

**D. Defendant's Public Response, Its Own Admissions, and the Texas Attorney General's Investigation**

23. Following publication of the study, Defendant did not dispute that its own products were tested or that they were found inconsistent with authentic avocado oil. Instead, Defendant issued a public statement disputing the study's suggestion that two of its mayonnaises and two of

[12] Lopez-Alvarez et al., *supra* note 8; LocalFats.com, *supra* note 1.

its dressings contain seed oils and maintaining that it never adds seed oils of any kind.[13] Defendant further stated that it believed the testing procedures used in the study did not fully account for the unique characteristics of finished products such as condiments and dressings.

24. The same public statement contains two admissions of central importance to this action. First, Defendant represented that it starts with "the same pure avocado oil" in its mayonnaise and dressings that is in its cooking oils; by Defendant's own account, one oil supply is common to its condiment and cooking oil lines. Second, Defendant represented that for years, all of its avocado oil has been tested for purity, both internally and by third parties, before it goes into any of its products.[14]

25. Defendant's account cannot be reconciled with the independent test results. If one common oil supply feeds Defendant's mayonnaise, dressings, and cooking oils, and if all of that oil is purity-tested before use, then the failure of Defendant's tested products in all eight tested lots permits only two conclusions: the represented testing did not occur as described, or the represented testing does not detect the seed-oil markers that independent laboratory analysis detected in every tested lot. On either account, Defendant's representations that the purity of its products is "guaranteed" and verified through batch testing were false or misleading when made, as to every product sold under them, including the Spray.

26. Defendant's response confirms that Defendant was aware, no later than August 2026, that an independent, peer-reviewed laboratory had specifically identified four of Defendant's own branded products as containing oil compositionally inconsistent with the "100% Pure

---

[13] Chosen Foods, *A Message to Our Community*, https://chosenfoods.com/blogs/central/a-message-to-our-community (last visited Aug. 27, 2026); see also Gelski, *supra* note 10; Jennie Schmidt, *Avocado oil claims coming under fire*, Food Business News (Aug. 25, 2026), https://www.foodbusinessnews.net/articles/30902-avocado-oil-claims-coming-under-fire.

[14] Chosen Foods, *A Message to Our Community*, *supra* note 13.

Avocado Oil" representation Defendant places on its packaging, including the packaging of the Spray Plaintiff purchased.

27. On August 20, 2026, Texas Attorney General Ken Paxton announced an industry-wide investigation into companies marketing products as "made with avocado oil." Defendant, along with Primal Kitchen and Siete Foods, received a civil investigative demand from the Texas Attorney General's office to determine whether Defendant violated the Texas Deceptive Trade Practices Act.[15] Attorney General Paxton stated that consumers should not have to worry about being deceived by labels when choosing healthier options at the grocery store, and that his office would hold accountable any company that violates the law and misleads consumers about what is actually in their food.

28. The Attorney General described the investigation as industry-wide and stated that additional civil investigative demands would follow. Defendant was nonetheless among the first three companies, together with Primal Kitchen and Siete Foods, to receive a formal civil investigative demand. Defendant responded to the study and to the investigation not by withdrawing or qualifying its purity representations, but by denying the findings while continuing to market and sell its Products, including the Spray, under the same unqualified "100% Pure Avocado Oil" labels and "guaranteed" purity claims.

**E. The Same "100% Pure Avocado Oil" Representation, and the Same Oil Supply, Stand Behind the Spray Plaintiff Purchased**

29. The Chosen Foods 100% Pure Avocado Oil Spray that Plaintiff purchased bears the same "100% Pure Avocado Oil" language, in the same brand typeface and presentation, that

---

[15] Press Release, Office of the Attorney General of Texas, *Attorney General Ken Paxton Investigates Avocado Oil Products for Deceptive Marketing and Potential Use of Undisclosed Seed Oils* (Aug. 20, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-investigates-avocado-oil-products-deceptive-marketing-and-potential-use; Gelski, *supra* note 10.

appears on Defendant's mayonnaise and salad dressing packaging, and that Defendant has, in its own words, applied to its avocado oils and sprays collectively. The Spray's label additionally represents that the product is "Naturally Refined" with a "Neutral Taste" and a "500°F Smoke Point," and is certified "Non-GMO."

30. Defendant's own statements establish that the avocado oil used across its product lines is drawn from a common supply and subjected to common testing practices, and that Defendant sources that oil through third-party oil brokers and suppliers. UC Davis researcher Selina Wang has identified reliance on a supplier's certificate of analysis, in place of independent verification of every incoming batch, as the point of failure that puts oil that is not fully authentic into finished products.[16]

31. On information and belief, the avocado oil used in the Spray is drawn from the same supply, sourced through the same brokers, and subjected to the same testing practices as the oil used in the four Chosen Foods products that failed authenticity testing in all eight tested lots, and the Spray accordingly contains, or at all material times was subject to a material and undisclosed risk of containing, oil that is not 100% pure avocado oil. Independent of the composition of any particular unit of the Spray, the representations under which the Spray was sold, that its purity is "guaranteed" and verified by batch testing of all of Defendant's oil, were false or misleading for the reasons alleged above. The Spray itself has not, to Plaintiff's knowledge, been independently laboratory-tested for authenticity; the basis for the foregoing allegations is Defendant's own description of its common oil supply and uniform testing practices, the failure of

[16] John Loftus, *'100% Avocado Oil' Products Might Not Be As Pure As Companies Advertise, Study Finds*, The Daily Caller (Aug. 11, 2026), https://dailycaller.com/2026/08/11/uc-davis-study-avocado-oil-products-fail-testing-cheap-oils-primal-kitchen-chosen-foods-kraft-heinz/.

every tested lot of the products made from that supply, and the persistent, well-documented adulteration of brokered avocado oil since at least 2020.

**F. The Avocado Oil Representation Is Material to Consumers**

32. The "100% Pure Avocado Oil" representation is material. It is important to consumers with respect to their decision to purchase Chosen Foods products, and Defendant knows it, having built its entire marketing identity around that representation.

33. Avocado oil is widely understood to be one of the healthiest food oils. Published research has indicated that compounds in avocado oil may help protect the liver, may lower blood pressure and LDL cholesterol, and may reduce osteoarthritis-related joint pain, post-meal blood sugar, and total cholesterol levels. Avocado oil is high in monounsaturated fat, which is generally considered more heart-healthy than saturated fat. Avocado oil is also in high demand because it has among the highest smoke points of the plant-based food oils, which makes it desirable for high-heat applications, including the non-stick cooking spray application at issue here.[17]

34. Avocado oil is a premium product that commands a substantially higher price than conventional vegetable oils such as soybean, sunflower, canola, and safflower oil. Products promoted for containing avocado oil consistently cost more than comparable conventional-oil products in the same category. This premium pricing would be unjustifiable if the Products did not actually contain the pure avocado oil advertised.

35. Materiality does not depend on whether a given consumer believes avocado oil is superior to other oils. Whether the oil in a food product is the oil the label says it is, rather than a cheaper oil substituted for it, is material to reasonable consumers standing alone. Consumers may

[17] See Healthline, *Evidence-Based Health Benefits of Avocado Oil*, https://www.healthline.com/nutrition/9-avocado-oil-benefits; MasterClass, *What Is Avocado Oil? A Guide to Cooking With Avocado Oil*, https://www.masterclass.com/articles/what-is-avocado-oil-a-guide-to-cooking-with-avocado-oil.

be allergic to, or may have religious, dietary, medical, or other reasons for not consuming, particular oils.

36. Consumers purchased, and continue to purchase, Defendant's Products in part because Defendant's "100% Pure Avocado Oil" representation and its accompanying purity guarantee convey the unequivocal message that the Products are made with authentic, unadulterated avocado oil and nothing else. Plaintiff and Class members would have paid less for the Products, or would not have purchased them at all, had they known that the Products did not conform to that representation, or that Defendant's guarantee and represented batch testing did not ensure that they conformed.

**G. Defendant's Knowledge of Adulteration Risk Predates the July 2026 Study**

37. The July 2026 UC Davis study is not the first to identify rampant adulteration of commercial avocado oil, and Defendant has known of that industry-wide problem since at least 2020. In June 2020, UC Davis researcher Selina Wang published a landmark peer-reviewed study in *Food Control* documenting that 82 percent of commercial avocado oil samples tested were either rancid, oxidized, or adulterated with cheaper oils.[18] Defendant itself has cited that very study, repeatedly, in its own marketing.

38. A subsequent 2023 UC Davis study found that nearly 70 percent of private-label avocado oils sold at retail were rancid or adulterated with other oils, a finding that Defendant likewise publicized in its own marketing as validating the relative purity of its own brand.[19]

39. Defendant is a sophisticated commercial food manufacturer that sources, formulates, manufactures, labels, and markets the Products nationwide. Defendant has held itself

[18] Green & Wang, *supra* note 7.

[19] Chosen Foods, *supra* note 2 (describing the 2023 UC Davis research published in Food Control); see also Hilary S. Green & Selina C. Wang, Food Control (2023), https://doi.org/10.1016/j.foodcont.2023.109837.

out, repeatedly and publicly, as intimately familiar with the peer-reviewed science documenting industry-wide avocado oil adulteration, citing that very science as the basis for its own purity claims. Defendant knew, or reasonably should have known, of the well-documented, persistent risk that avocado oil supplied through third-party brokers, the very supply model Defendant uses, is frequently adulterated, and Defendant nevertheless continued, and continues, to make an unqualified "100% Pure" and "guaranteed" representation across its entire avocado oil product line, including the Spray. Defendant made those unqualified representations, and in January 2026 built a national advertising campaign around the absence of seed oils from its products, without undertaking the independent, batch-level verification of incoming oil that the science Defendant itself cited showed was necessary to support them.

**H. Plaintiff's Purchases in Reliance on Defendant's Representations**

40. Plaintiff purchased two units of Chosen Foods 100% Pure Avocado Oil Spray

41. Plaintiff has also purchased Chosen Foods Classic Mayo on multiple occasions in reliance on the same "100% Pure Avocado Oil" representation that appears on that product's label. Chosen Foods Classic Mayo is one of the four Chosen Foods products that UC Davis independently tested and found, in both production lots examined, to contain oil compositionally inconsistent with authentic avocado oil.

42. Plaintiff's purchases occurred before the July 2026 UC Davis study was published, before Defendant's public statement responding to that study, and before the Texas Attorney General's investigation was announced. Plaintiff purchased the Spray and the Classic Mayo in reliance on the "100% Pure Avocado Oil" representation on their front labels and on Defendant's broader, longstanding public reputation, built substantially on Defendant's own repeated invocation of UC Davis's 2020 findings, as a brand "guaranteed" to be pure.

43. Had Plaintiff known, at the time of her purchases, that the Classic Mayo did not contain 100% pure avocado oil; that the common oil supply and represented batch testing behind Defendant's "guaranteed" purity claims did not ensure that any Chosen Foods product, including the Spray, conformed to its label; and that the very Classic Mayo she purchased, along with three other Chosen Foods products bearing that same guarantee, would shortly be shown to contain oil inconsistent with authentic avocado oil, she would not have purchased the Spray or the Classic Mayo at the prices she paid, or would not have purchased them at all.

44. Plaintiff relied on the label representations that the Spray and the Classic Mayo each contained 100% pure avocado oil. Plaintiff saw and read the words "100% Pure Avocado Oil" on the front of each package before buying it and took those representations into consideration in deciding to make her purchases.

45. As a repeat purchaser of avocado oil products in reliance on Defendant's purity guarantee, Plaintiff will be unable to rely on the "100% Pure Avocado Oil" representation on Defendant's Products in the future absent independent verification that Defendant has corrected the sourcing and testing failures reflected in the July 2026 UC Davis findings. Plaintiff remains interested in purchasing avocado oil products, intends to purchase such products, including Chosen Foods Classic Mayo, in the future, and would consider purchasing Defendant's Products again if Defendant ensured that its purity representations were accurate and substantiated. Plaintiff accordingly faces an ongoing injury that damages alone will not remedy.

**I. Prescription and Limitations Periods Were Suspended**

46. The adulteration alleged herein is inherently self-concealing. The composition of the oil in the Products cannot be determined by inspection, taste, or any other means available to an ordinary consumer; it can be determined only through specialized laboratory analysis of fatty

acid and sterol profiles of the kind the UC Davis researchers performed. Defendant's affirmative and repeated representations of guaranteed purity, batch testing, and grove-to-bottle traceability further concealed the true facts and assured consumers, including Plaintiff, that no inquiry was necessary. Neither Plaintiff nor any reasonably diligent Class member knew, or could have known, the facts giving rise to these claims before publication of the July 2026 UC Davis study.

47. All applicable prescriptive and limitations periods were accordingly suspended or tolled, under Louisiana's doctrine of *contra non valentem* and under the discovery-rule and fraudulent-concealment doctrines of the other applicable states, until July 11, 2026, at the earliest.

48. Plaintiff's redhibition claims are timely in any event: prescription on a redhibition claim against a seller in bad faith, including a manufacturer presumed to know of the defects in the things it makes, runs one year from the day the defect was discovered. La. Civ. Code arts. 2534(B), 2545. The claims of Plaintiff and the Louisiana Subclass under the general law of sale and conventional obligations are personal actions subject to a liberative prescription of ten years. La. Civ. Code art. 3499.

49. Plaintiff's delictual claims are subject to a liberative prescription of one year for causes of action arising before July 1, 2024, and of two years for causes of action arising on or after that date, in each case suspended by *contra non valentem* as alleged above. See La. Civ. Code art. 3493.1; former La. Civ. Code art. 3492. The one-year period applicable to claims under the Louisiana Unfair Trade Practices Act, La. R.S. 51:1409(E), is prescriptive rather than preemptive, see *Miller v. Conagra, Inc.*, 991 So. 2d 445 (La. 2008), and was likewise suspended.

## CLASS ALLEGATIONS

50. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class (the "Class"):

> All persons or entities in the United States who purchased Chosen Foods avocado oil-labeled products bearing the "100% Pure Avocado Oil" representation, including Chosen Foods avocado oil, avocado oil spray, avocado oil mayonnaise, and avocado oil salad dressings and marinades, on or after June 6, 2023, through the date of filing of this Complaint. Excluded from the Class are Defendant, its affiliates, subsidiaries, employees, officers, and directors.

51. Plaintiff additionally brings this action on behalf of the following subclass (the "Louisiana Subclass"):

> All persons or entities who purchased Chosen Foods avocado oil-labeled products bearing the "100% Pure Avocado Oil" representation in the State of Louisiana on or after June 6, 2023, through the date of filing of this Complaint.

52. Also excluded from the Class and the Louisiana Subclass are: Defendant and its parents, subsidiaries, and affiliates, and any entity in which Defendant has a controlling interest; Defendant's officers, directors, and current or former employees; all individuals who make a timely election to be excluded from this proceeding using the correct opt-out protocol; all judges assigned to hear any aspect of this litigation, together with their immediate family members; and any persons asserting claims for personal injury.

53. Plaintiff reserves the right to amend or modify the Class and Louisiana Subclass definitions before the Court determines whether class certification is appropriate, including by narrowing either definition to particular products (such as the four Chosen Foods products independently tested by UC Davis), by adding subclasses (including subclasses defined by state of purchase), or otherwise, based on facts learned through further investigation and discovery, including discovery into whether the Spray and Defendant's bottled avocado oil share the adulteration found in Defendant's tested mayonnaise and dressing products.

54. **Numerosity.** The Class is so numerous that joinder of all members would be impracticable. Based on Defendant's self-described status as "America's #1 Avocado Oil" brand,

its national distribution through major retailers, and more than three years of sales under its "100% Pure," "guaranteed" marketing campaign, the Class likely comprises hundreds of thousands of consumers. Given the substantial premium pricing on avocado oil products relative to conventional-oil alternatives, the aggregate damages to the Class are substantial and likely exceed the $5 million CAFA threshold.

55. **Commonality.** Questions of law and fact common to the Class predominate over any questions affecting individual Class members. All Class members were exposed to identical or substantially similar labeling, marketing, and representations regarding avocado oil purity, including Defendant's "100% Pure" and "guaranteed" branding. All suffered the same economic injury: overpayment for products that did not meet advertised specifications.

56. The common questions that will drive the resolution of this action, and that predominate over any questions affecting only individual Class members, include: (a) whether Defendant misrepresented material facts, or failed to disclose material facts, in connection with the packaging, marketing, distribution, and sale of the Products; (b) whether the oil used to make the Products is 100% pure avocado oil; (c) whether the "100% Pure Avocado Oil" representation constituted false or deceptive advertising; (d) whether Defendant's representations that it guarantees purity and tests every batch of its oil were false or misleading; (e) whether Defendant engaged in unfair, unlawful, or fraudulent business practices; (f) whether Defendant's conduct was intentional and knowing; (g) whether the Products commanded a price premium as a result of the "100% Pure Avocado Oil" representation, and if so in what amount; (h) whether Plaintiff and the Class are entitled to damages, restitution, or disgorgement, and if so in what amount; (i) whether Plaintiff and the Class are entitled to injunctive relief; (j) whether Plaintiff and the Class are entitled

to statutory, treble, or punitive damages, and if so in what amount; and (k) whether Plaintiff and the Class are entitled to an award of reasonable attorney fees, interest, and costs of suit.

57. Defendant has engaged in a common course of conduct giving rise to violations of the legal rights that Plaintiff seeks to enforce uniformly on behalf of the Class. The injuries sustained by Class members flow from a common nucleus of operative fact: Defendant's uniform "100% Pure Avocado Oil" packaging representation and brand-wide purity guarantee, and the falsity of that representation and guarantee as alleged herein. Individual questions, if any, pale in comparison to the common questions presented.

58. **Typicality.** Plaintiff's claims are typical of those of the Class. Like all Class members, Plaintiff purchased a Chosen Foods avocado oil-labeled product in reliance on Defendant's "100% Pure Avocado Oil" representation, paid a premium price, and, as alleged herein, received a product that did not conform to that representation or that was sold subject to an undisclosed, material risk of nonconformity.

59. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to the Class and has retained experienced class action counsel.

60. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual litigation by each Class member would be prohibitively expensive and would result in inconsistent judgments. Class adjudication promotes judicial efficiency and provides the sole practical means for Class members to vindicate their small individual claims.

61. **Rule 23(b)(2).** Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2). Defendant has acted, or failed to act, on grounds generally applicable to

Plaintiff and the Class, which makes final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole.

62. **Ascertainability.** Class members are identifiable and ascertainable through Defendant's records, retailer and distributor records, membership and loyalty program records maintained by retailers and other objective criteria, together with self-identification by affidavit where appropriate.

## CAUSES OF ACTION

### COUNT I: BREACH OF EXPRESS WARRANTY

**(On Behalf of Plaintiff and the Class; for Plaintiff and the Louisiana Subclass, Under La. Civ. Code art. 2529 and the Law of Conventional Obligations)**

63. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

64. By labeling its Products "100% Pure Avocado Oil," by publicly guaranteeing that the Products are "100% pure," and by representing that it tests every batch of its oil, Defendant made express warranties to consumers. These representations constituted affirmations of material fact regarding the identity, purity, and composition of the oil used in the Products.

65. For Class members whose purchases are governed by the law of a state that has adopted Article 2 of the Uniform Commercial Code, the "100% Pure Avocado Oil" representation is (a) an affirmation of fact or promise made by Defendant to consumers that the Products are made entirely with authentic avocado oil; (b) a representation that became part of the basis of the bargain when consumers relied on it in deciding to purchase the Products; and (c) the creation of an express warranty that the Products would conform to that affirmation of fact or promise. In the alternative, the representation is a description of the goods that was made part of the basis of the

bargain and that created an express warranty that the Products would conform to that description. See U.C.C. § 2-313, as enacted in the applicable states of purchase.

66. For Plaintiff and the Louisiana Subclass, Louisiana law, not the Uniform Commercial Code, governs. When the thing delivered is free of redhibitory defects but is not of the kind or quality represented by the seller, the buyer's rights are governed by the general rules of sale and conventional obligations rather than by redhibition. La. Civ. Code art. 2529. Plaintiff and the Louisiana Subclass accordingly plead their express warranty theory under La. Civ. Code art. 2529 and ordinary contract principles, as a claim independent of, and in the alternative to, the redhibition claim set forth in Count II below.

67. To the extent the law of any applicable state conditions recovery for breach of express warranty on pre-suit notice, see, e.g., U.C.C. § 2-607(3)(a), that condition is satisfied or excused: Defendant received actual notice of the nonconformity of its products no later than July 2026, when the UC Davis study publicly identified four of Defendant's products by name and Defendant publicly responded to it; Defendant received further notice through the Texas Attorney General's civil investigative demand; pre-suit notice by retail consumer purchasers is excused or relaxed under the law of many states; further notice would have been futile in light of Defendant's public denial of the findings and its continued sale of the Products under the same representations; and this Complaint itself provides notice.

68. Plaintiff and Class members reasonably and justifiably relied on the foregoing express warranties, believing that the Products did in fact conform to them. These representations appeared on product labels, packaging, and marketing materials, and constituted the basis of the bargain between Defendant and consumers.

69. Defendant breached these express warranties. Chosen Foods Classic Mayo, one of the products Plaintiff purchased, is one of the four Chosen Foods products independently tested by UC Davis, and both tested lots of that product contained oil compositionally inconsistent with authentic avocado oil. As to the Spray purchased by Plaintiff, on information and belief the oil used in the Spray is drawn from the same supply that produced the failed lots and does not conform to the warranty; and in any event Defendant breached its warranties that the Products' purity was "guaranteed" and verified through testing of every batch of its oil, because the promised verification either was not performed as represented or did not ensure the conformity it promised.

70. Plaintiff and Class members were injured by Defendant's breach of express warranty. They paid premium prices for products that did not conform to Defendant's express representations regarding oil purity, or that were sold subject to an undisclosed and material risk of nonconformity that made them worth less than the prices paid.

**COUNT II: REDHIBITION (LA. CIV. CODE ARTS. 2520–2548)**

**(On Behalf of Plaintiff and the Louisiana Subclass)**

71. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

72. Louisiana law implies a warranty against redhibitory defects, or vices, in every sale of a movable. La. Civ. Code art. 2520. A defect is redhibitory when it renders the thing sold either useless, or its use so inconvenient or imperfect, that it must be presumed a buyer would not have bought the thing had he known of the defect, or when it diminishes the thing's usefulness or value such that a buyer would still have bought it, but for a lesser price. La. Civ. Code arts. 2520–2521. Defendant is the manufacturer of the Products, which are sold to consumers, including Plaintiff and the Louisiana Subclass, through retailers.

73. The Products suffer from a redhibitory defect. Defendant represents on the front of every package, including the Spray and the Classic Mayo, that the Products contain "100% Pure Avocado Oil." In fact, independent laboratory testing has shown that Chosen Foods Classic Mayo, one of the products Plaintiff purchased, along with Defendant's other tested mayonnaise and salad dressing products sold under the identical purity representation, contains oil that is adulterated, diluted, or substituted with cheaper vegetable or seed oils inconsistent with that representation, and, on information and belief, the Spray contains oil drawn from the same supply and suffers from the same vice. A reasonable buyer who knew these facts would not have purchased the Products or would have purchased them only at a substantially reduced price. The defect, to the extent it exists in a given unit, was not discoverable by simple inspection, since the true composition of the oil can be determined only through laboratory analysis of the kind performed by the UC Davis researchers. La. Civ. Code arts. 2521, 2530.

74. As the manufacturer of the Products, Defendant is presumed to know of the redhibitory defect described herein. La. Civ. Code art. 2545. A manufacturer is deemed to know of the defects in the things it makes and is therefore liable to the buyer for the return of the price, with interest from the time it was paid, for reimbursement of the reasonable expenses occasioned by the sale, and for damages and reasonable attorney fees. Id. In the alternative, even a good faith seller unaware of the defect is bound to repair, remedy, or correct the defect, or, if that cannot be done, to restore the price with interest, or to reduce the price. La. Civ. Code art. 2531.

75. Plaintiff and the Louisiana Subclass are entitled to a reduction of the purchase price paid for the Products (*quanti minoris*), or, in the alternative, rescission of the sale and return of the purchase price, together with interest, reasonable expenses occasioned by the sale, damages, and reasonable attorney fees, pursuant to La. Civ. Code art. 2545. To the extent formal pre-suit notice

of the defect is required under La. Civ. Code art. 2522, this action itself constitutes such notice, and additional notice would in any event have been futile in light of Defendant's continued marketing of the Products as "100% Pure Avocado Oil" after the July 2026 UC Davis findings, its public denial of those findings, and the Texas Attorney General investigation described above. Further, a manufacturer, being conclusively presumed to know of the defects in the things it makes, La. Civ. Code art. 2545, is a seller in bad faith who cannot claim prejudice from any want of earlier notice; and because the Products are consumable foodstuffs, no repair of the defect was possible, so the only consequence article 2522 attaches to a failure of notice, diminution of the warranty to the extent the defect could have been repaired, can have no application here.

**COUNT III: VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT, LA. R.S. 51:1401, ET SEQ.**

**(By Plaintiff Individually and, in the Alternative, on Behalf of the Louisiana Subclass)**

76. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

77. The Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, et seq., prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. La. R.S. 51:1405. Defendant's conduct as alleged herein offends established public policy and is unethical, oppressive, unscrupulous, and substantially injurious to consumers.

78. Defendant's labeling and marketing of its avocado oil products violated LUTPA by: (a) representing that the Products contained 100% pure avocado oil when the four Chosen Foods products independently tested contained adulterated or substituted oils in every lot tested; (b) representing that Defendant guarantees purity and tests every batch of its oil when the represented testing either was not performed as described or did not ensure the purity represented;

(c) creating a false impression regarding the quality, origin, and composition of the Products, including the Spray; and (d) omitting material facts about the composition of the Products and the reliability of Defendant's purity verification that a reasonable consumer would consider important in deciding whether to purchase. These acts and omissions occurred in connection with Plaintiff's purchases in Louisiana and Louisiana Subclass members' purchases in Louisiana.

79. Defendant's unfair and deceptive acts and practices were directed at consumers and affected the consumer decision-making process. The deceptive labeling, the "100% Pure" and "guaranteed" marketing campaign, and premium pricing directly induced the purchases of Plaintiff and Louisiana Subclass members, who suffered an ascertainable loss of money as a result: the price, or price premium, they paid for Products that did not conform, or could not be counted on to conform, to the purity represented.

80. La. R.S. 51:1409(A) provides that a private person may bring an action "individually but not in a representative capacity." Plaintiff therefore asserts this Count in her individual capacity. In the alternative, and solely to the extent that Federal Rule of Civil Procedure 23 governs the availability of class treatment in this Court notwithstanding section 1409(A), see *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), Plaintiff asserts this Count on behalf of the Louisiana Subclass.

81. Under La. R.S. 51:1409(A), Plaintiff is entitled to recover her actual damages, together with reasonable attorney fees and costs. Should Defendant be found to have knowingly used the unfair or deceptive methods, acts, or practices described herein after being put on notice by the Louisiana Attorney General, Plaintiff will additionally be entitled to an award of three times the actual damages sustained, and Plaintiff seeks treble damages to the full extent that statutory predicate is or becomes satisfied.

82. As alleged above, the one-year period of La. R.S. 51:1409(E) is prescriptive, not preemptive, and was suspended by *contra non valentem* until publication of the July 2026 UC Davis study.

**COUNT IV: FRAUDULENT MISREPRESENTATION**

**(On Behalf of Plaintiff and the Class)**

83. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

84. Defendant made material representations in its labeling and marketing that its Products, including the Spray and the Classic Mayo, were "100% Pure Avocado Oil," and that Defendant guaranteed and verified that purity through testing of every batch of its oil. Those representations were false as to the Classic Mayo Plaintiff purchased, which was among the four Chosen Foods products independently tested by UC Davis and found compositionally inconsistent with authentic avocado oil in both lots examined; false or misleading as to the Spray, which on information and belief contains oil drawn from the same supply; and false or misleading as statements about Defendant's own verification practices, which either did not occur as represented or did not detect what independent testing detected in every tested lot.

85. Defendant either knew that these representations were false or misleading, or acted with reckless disregard for their truth. Defendant had actual knowledge of the 2020 and 2023 UC Davis studies documenting widespread adulteration in the avocado oil marketplace and of the broker-based supply model those studies implicated; Defendant cited those very studies in its own marketing as validation of its purity, and in January 2026 built a national advertising campaign around the absence of seed oils from its products. Defendant nevertheless continued to make unqualified, brand-wide "100% Pure" and "guaranteed" representations without the independent,

batch-level verification necessary to support them. When the July 2026 UC Davis study identified failures in all eight tested lots of Defendant's four tested products, Defendant did not withdraw or qualify its purity guarantee; it publicly denied the findings while continuing to sell the Spray and its other Products under the identical, unqualified representations. Defendant's conduct constitutes, at minimum, reckless disregard for the truth of its representations.

86. Defendant intended for consumers to rely on these representations, or at minimum, knew that consumers would foreseeably rely on them in making purchasing decisions.

87. Plaintiff and Class members reasonably relied on Defendant's representations that the Products contained 100% pure, authentic avocado oil and that Defendant's purity guarantee was backed by batch testing. Plaintiff would not have purchased the Spray or the Classic Mayo at the premium prices she paid had she known that the Classic Mayo did not conform to that representation and that Defendant's guarantee and represented batch testing did not ensure conformity across its product line, including the Spray.

88. Plaintiff's and Class members' reliance was reasonable and justifiable. The true composition of the oil in the Products could not be ascertained without specialized laboratory analysis, and could not have been discovered by consumers without difficulty, inconvenience, or special skill.

89. Plaintiff and Class members suffered damages as a direct and proximate result of their reliance on Defendant's misrepresentations. Plaintiff paid $14.79 per unit for the Spray and paid a premium price for the Classic Mayo, products she would not have purchased, or would have purchased only at significantly lower prices, had she known the truth.

**COUNT V: FRAUD IN THE INDUCEMENT: RESCISSION, DAMAGES, AND ATTORNEY FEES (LA. CIV. CODE ARTS. 1948, 1953, 1955, 1958)**

**(On Behalf of Plaintiff and the Louisiana Subclass)**

90. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

91. Under Louisiana law, consent to a contract may be vitiated by fraud. La. Civ. Code art. 1948. Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. La. Civ. Code art. 1953.

92. Each purchase of a Product by Plaintiff or a Louisiana Subclass member was a contract of sale, and the purchaser's consent to that contract was procured by Defendant's misrepresentations that the Product contained 100% pure avocado oil and that Defendant guaranteed and verified that purity by testing every batch of its oil, and by Defendant's suppression of the truth regarding the composition of its common oil supply and the limits of its verification practices. Defendant made these misrepresentations and suppressions with the intention of obtaining an unjust advantage: the premium price that "100% Pure Avocado Oil" commands.

93. The fraud concerned circumstances that substantially influenced consent. Purity was the very attribute for which Plaintiff and Louisiana Subclass members paid a premium. La. Civ. Code art. 1955.

94. The exception of La. Civ. Code art. 1954 does not apply. The truth about the composition of the oil in the Products could not have been ascertained without difficulty, inconvenience, or special skill, because it is determinable only through specialized laboratory analysis; and the reliance of Plaintiff and Louisiana Subclass members on Defendant's assertions of guaranteed, batch-tested purity was reasonably induced by those assertions.

95. A contract whose formation is vitiated by fraud is relatively null. La. Civ. Code art. 2031. Upon annulment, the parties are restored to the situation that existed before the contract was

made. La. Civ. Code art. 2033. Plaintiff and the Louisiana Subclass are accordingly entitled to rescission of their purchases and restoration of the price with interest; and because rescission is sought on account of fraud, Defendant is liable for damages and attorney fees. La. Civ. Code art. 1958. This Count is pleaded in the alternative to Plaintiff's claims for damages to the extent the law requires an election.

**COUNT VI: NEGLIGENT MISREPRESENTATION (LA. CIV. CODE ARTS. 2315, 2316)**

**(In the Alternative, on Behalf of Plaintiff and the Louisiana Subclass)**

96. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

97. In the alternative to Count IV, and without conceding that Defendant's conduct was anything less than knowing or reckless, Plaintiff alleges that Defendant negligently misrepresented the composition and purity of the Products.

98. As the manufacturer, labeler, and marketer of the Products, Defendant had a legal duty, in the course of selling the Products to consumers, to supply correct information on its labels and in its marketing, and to exercise reasonable care in making representations about the composition and purity of its Products, upon which Defendant knew consumers would rely.

99. Defendant breached that duty by representing the Products as "100% Pure Avocado Oil," guaranteed and batch-tested, without exercising reasonable care to verify those representations, including by relying on supplier certificates of analysis and other practices inadequate to detect the adulteration documented across the industry since 2020 and detected in every tested lot of Defendant's own products in 2026.

100. Plaintiff and Louisiana Subclass members justifiably relied on those representations and sustained pecuniary loss, in the form of the price and price premium paid, as a direct and proximate result of Defendant's breach. La. Civ. Code arts. 2315, 2316.

**COUNT VII: UNJUST ENRICHMENT**

**(In the Alternative, on Behalf of Class Members Who Purchased Outside Louisiana, Under the Laws of Their States of Purchase)**

101. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

102. This Count is pleaded solely in the alternative, pursuant to Federal Rule of Civil Procedure 8(d)(2), and solely on behalf of Class members whose purchases were made outside Louisiana, under the unjust enrichment or restitution law of their respective states of purchase. Because Louisiana law makes the action for enrichment without cause subsidiary to other available remedies, La. Civ. Code art. 2298, this Count is not asserted on behalf of Plaintiff or the Louisiana Subclass.

103. Class members who purchased outside Louisiana conferred a benefit upon Defendant by paying premium prices for Products they believed to contain authentic, 100% pure avocado oil. Defendant received and retained those payments.

104. Defendant's retention of those benefits would be unjust and inequitable, because the payments were obtained through the false or misleading purity representations and guarantee alleged herein, and because the Products delivered did not conform, or could not be counted on to conform, to what was promised.

105. To the extent required by the law of any applicable state, the Class members on whose behalf this Count is brought lack an adequate remedy at law, or assert this Count in the alternative to their legal claims as that state's law permits.

106. Such Class members are entitled to restitution and disgorgement of the unjust profits and benefits Defendant obtained from them.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all claims in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Karoline Hebert, on behalf of herself and all members of the Class, respectfully requests that this Court:

1. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3);

2. Appoint Plaintiff Karoline Hebert as representative of the Class and her counsel as Class Counsel;

3. Enter judgment against Defendant in favor of Plaintiff and the Class for all damages sustained, including but not limited to the premium price paid for the Products;

4. Enter a declaration that Defendant's actions, as described herein, violate the laws described herein;

5. Enter a finding in favor of Plaintiff and the Class against Defendant on all counts asserted herein;

6. Award Plaintiff and the Class restitution and other equitable relief, including without limitation rescission of Plaintiff's and Louisiana Subclass members' purchases with restoration of the purchase price and interest, and restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of the unlawful, unfair, and deceptive business practices described herein;

7. Award nominal damages;

8. Award punitive or exemplary damages and statutory damages under the laws of those states that authorize such awards, and pursuant only to those causes of action so permitting;

9. Award treble damages pursuant to La. R.S. 51:1409(A) to the extent the statutory conditions for such an award are satisfied;

10. Award Plaintiff and the Class pre-judgment and post-judgment interest at the highest rate permitted by law;

11. Award Plaintiff and the Class reasonable attorney fees and litigation costs, including pursuant to La. Civ. Code arts. 1958 and 2545 and La. R.S. 51:1409(A);

12. Award costs of administering the Class relief;

13. Impose an injunction requiring Defendant to: (a) cease representing its Products as "100% Pure Avocado Oil" or "guaranteed" pure unless and until Defendant can substantiate that representation through independent third-party testing; (b) disclose the true composition and identity of cooking oils used in its Products; (c) implement independent third-party laboratory testing to verify avocado oil authenticity prior to sale, rather than relying solely on suppliers' certificates of analysis; and (d) engage in corrective advertising to notify Class members of the adulteration findings described herein;

14. Enter an order prohibiting Defendant from making the "100% Pure Avocado Oil" representation on the Products unless and until the Products are in fact made with avocado oil conforming to the applicable compositional criteria, including the criteria codified in the Codex Alimentarius Standard for Named Vegetable Oils (CXS 210-1999, as amended to include avocado oil in November 2024); and

15. Award such other and further relief as this Court deems just, proper, and equitable under the circumstances.

Respectfully Submitted,

DALY & BLACK, P.C.

*/s/ Blake Corley*

Blake E. Corley, LSBA #39848, Lead Counsel
Richard G. Perque, LSBA #30669
400 Poydras St., Ste. 1900
New Orleans, LA 70130
www.dalyblack.com
Phone: (504) 800-8508
Fax: (713) 655-1587
bcorley@dalyblack.com
rperque@dalyblack.com
*Counsel for Plaintiff, Individually and on Behalf of All Others Similarly Situated*